**UNITED STATES of America,**
**Plaintiff,**

v.

**ONE 1992 LEXUS SC400 VIN**
**JT8UZ30C2N0017133, et**
**al., Defendants.**

**No. 96 C 5116.**

United States District Court,
N.D. Illinois,
Eastern Division.

May 12, 2001.

Anthony James Masciopinto, United States Attorney's Office, Chicago, IL, for United States.

Patrick Alan Tuite, Arnstein & Lehr, Chicago, IL, for Keshia Oates Jean Harrison.

## MEMORANDUM OPINION AND ORDER

NORDBERG, Senior District Judge.

The government is seeking forfeiture of a car, a diamond tennis bracelet, and a diamond ring that were given as presents to claimant Keshia Oates by her boyfriend Vernon Harrison, who is a convicted narcotics trafficker. This court previously held a hearing and determined that there was probable cause to believe that these three properties were purchased with money from Harrison's illegal drug dealing and therefore are forfeitable as "proceeds" under 21 U.S.C. § 881(a)(6).

Thereafter, Keshia Oates filed a motion for summary judgment. She does not challenge the prior finding of probable cause, which she is entitled to do, but instead seeks to rely on the innocent owner defense contained in the statute. She argues that, while there may be some evidence suggesting she knew her boyfriend was a drug dealer, there is absolutely no evidence that she ever affirmatively consented to that activity. She thus seeks to qualify as an innocent owner under the "consent" prong of the defense. This argument does not turn on a factual question

but instead requires that we take a position in an ongoing debate over how to interpret the innocent owner defense in the situation where, as here, the claimant obtains ownership of the property sometime after the illegal act tainting the property. As set forth below, we disagree with the interpretation of the statute relied upon by claimant and therefore deny her summary judgment motion.

We then consider the government's cross-motion, which requires that we determine whether claimant has enough evidence to qualify as an innocent owner under the "knowledge" prong of the defense. Although this question requires some statutory interpretation as well, it is really more of a fact-based question under the summary judgment standard.

### FACTUAL BACKGROUND

The following facts are undisputed unless otherwise noted. In December 1993, Vernon Harrison met Keshia Oates at popular Chicago nightclub.[1] At the time, Oates was living in Los Angeles but was on a visit to Chicago, where her mother was living. Harrison apparently was immediately attracted to Oates because, that night, he offered to fly her back to Chicago, rent her an apartment, and buy her a car.

After two weeks of long distance phone conversations with Harrison, Oates agreed to move to Chicago "to further her relationship" with Harrison. (2/26/98 Oates Mem. at 1.) Harrison sent her a plane ticket. Shortly after Oates arrived in Chicago, Harrison provided her with an apartment located at 440 N. McClurg Court. The rental on the apartment was $1300 a month, which Harrison paid. Although this apartment was for Oates and only she lived there, the apartment was actually leased in the name of Harrison's sister. Harrison lived at a separate apartment in the Loop. Harrison also gave Oates a car—a 1992 Nissan 300 ZX. This car was not registered in Oates' name. Harrison owned at least two cars for himself—an LTD and a 1992 Mercedes Benz. In addition to the apartment and car, Harrison gave Oates a weekly allowance of $700.

In September of 1993, several months before Oates met Harrison and moved to Chicago, Harrison was arrested on state narcotics charges and was released on bond pending trial.[2] In January 1995, Harrison was convicted and began serving a nine-year jail sentence. In November 1994, less than two months before he went to prison, Harrison bought Oates a 1992 Lexus SC400 for $15,200 plus the trade-in of the Nissan 300ZX. Unlike the Nissan ZX, the Lexus was registered in Oates' name. A month later, in December 1994, Harrison bought Oates a gold and diamond tennis bracelet (10 carats). The bracelet cost $10,000, and Harrison paid for it in cash.

Starting in 1995, Oates visited Harrison in prison approximately every other weekend. During this time period, she continued to receive the weekly allowance, which had been increased to approximately $1000 a week. The allowance was paid in cash in an envelope that Oates picked up from the gas station owned by Harrison. In June 1995, while he was still in jail, Harrison gave Oates a 2.5 carat diamond ring, which cost $15,000. In December 1995, Harrison agreed to buy Oates a 1996 Range Rover after she said that she needed a truck for

---

1. The government asserts that this first meeting took place in May of 1993—not December.

2. This assumes Oates' version of the facts. Under the government's version, Oates met Harrison in May of 1993, which would have been a number of months before he was arrested.

the winter months in Chicago. Because he was in prison, Harrison told Oates to contact his mother (Jean Harrison) who would buy the car. The Range Rover cost $70,300. Jean Harrison paid for the $20,000 deposit by writing a check from her personal account. Although Jean Harrison had only worked in low-paying jobs, she somehow accumulated a significant amount of assets.[3] The Range Rover was initially included in this forfeiture action but was later released to an innocent third-party lien holder.

In April 1996, the government seized the properties in this action—the 1992 Lexus, the diamond tennis bracelet, and the diamond ring. On April 11, 1996, three members of a DEA task force went to Oates' McClurg Court apartment and interviewed her. Included in the group was a DEA task force agent named Joel Howard. According to Howard, Oates made the following admissions in the interview: (i) at the time she received the first car and was provided the apartment, she believed that Harrison might be involved in narcotics; (ii) various people told her that Harrison was involved in narcotics; (iii) Harrison told her he was involved in narcotics; (iv) she saw Harrison in her apartment with bags containing large amounts of cash; and (v) she asked that Harrison put the 1992 Lexus in her name because she knew that he was on trial for narcotics violations and was worried the car might be taken away from her. In a subsequent deposition, Oates denied making these statements to Agent Howard, and she testified that she did not know about her boyfriend's drug dealing until 1996 when she was informed by her current attorney of this forfeiture action against her property.

On January 21, 1998, this court held a probable cause hearing. Agent Howard testified as the government's only witness. He began by explaining that Vernon Harrison was known on the street as a mid to high level drug dealer on the West Side of Chicago and possibly in the suburbs. He then testified about various cash payments made by Harrison, the narcotics conviction, and the admissions made by Oates during the April 1996 interview. Oates' attorney brought out on cross-examination that there was no evidence Oates had been involved in any of the drug transactions at issue, that she had cooperated with the DEA agents by agreeing to be recorded while placing a call to Harrison's mother, and that Harrison did own a gas station business.

At the end of the probable cause hearing, this court orally set forth its ruling. This court concluded that Agent Howard was a credible witness who gave truthful testimony. Based on his testimony, this court ruled that there was probable cause to believe that a "nexus existed" between the subject property and Vernon Harrison's drug activities. This ruling was based on the amount of property controlled by Harrison, his conviction for drug trafficking, his use of cash, and the amount of money he spent on Oates. This court also concluded that the legitimate funds from the gas station business owned by Harrison were not enough to purchase the property involved within the time periods involved.

## DISCUSSION

 The government has met its initial burden of establishing probable cause to believe that the three properties given to claimant Keshia Oates are "proceeds

---

**3.** Specifically, from 1981 to approximately 1992, Jean Harrison worked as a housekeeper for Bethany Hospital, earning between $7 and $9 per hour. Prior to this job, she was on public aid. In a 1994 loan application, she represented that she owned three parcels of real estate and that she had a net worth of approximately $600,000.

traceable to" an illegal drug transaction. 21 U.S.C. § 881(a)(6).[4] Claimant seeks to qualify as an innocent owner under § 881(a)(6), which states that "no property shall be forfeited under this paragraph, to the extent of the interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner." She has the burden of proving this defense and can do so by showing that the illegal act with which the property was associated was done without her "knowledge" or "consent." *See United States v. $87,118.00 In U.S. Currency*, 95 F.3d 511, 518 (7th Cir.1996) ("Once the government has met its burden of establishing probable cause, 'the ultimate burden shifts to the claimant to prove by a preponderance of the evidence that the property is not subject to forfeiture.' ").

## I. Lack Of Consent.

In her summary judgment motion, claimant begins by conceding that there is a factual dispute that would preclude summary judgment in her favor under the knowledge prong of the innocent owner defense. She wants to by-pass the knowledge prong and go right to the consent prong because she believes that she has a winning argument there. Her argument rests on the fact that she is a post-illegal act transferee, meaning that she acquired the property sometime *after* the illegal act tainting the property. The forfeiture statute was not written with this type of claimant in mind, and courts have split over how to apply the defense in this situation. As we explain in greater detail below, claimant seeks to take advantage of what one court has called a "gaping loophole" in the statutory language, one that allows a

claimant in her situation to *always* qualify as an innocent owner even if she knew when she received the property that it was connected to an illegal drug transaction.

This general issue is complex and has been analyzed in a number of different ways by courts and commentators. To understand the issue, it will be helpful to first set out how the innocent owner defense works in the case of the typical claimant, now referred to as a pre-illegal act transferee. *See Fitzgerald v. Chrysler Corp.*, 116 F.3d 225, 227 (7th Cir.1997) (in considering applications of a statute it is often helpful "identify the prototype situation to which the statute is addressed"). As originally conceived, the innocent owner defense is fairly straightforward. Congress thought it unfair to allow the government to confiscate property used in a crime when the property owner did not know her property was being used by some third party to help commit a crime. If the property owner did not know about the illegal use, then she could not have prevented it. Thus, the statute provides that a property owner may keep his property if he can show that the "illegal act" was committed "without [his] knowledge." One example often cited is that of a landlord who was unaware that one of his tenants was selling drugs out of the landlord's building.

In addition to this knowledge prong, the statute provides that a claimant may qualify as an innocent owner if the illegal act was committed "without [his] consent." This consent prong was added to address the situation where the property owner knew about the illegal activity but could not stop it despite trying to do so. For example, a landlord might erect signs

---

**4.** Section 881(a)(6) provides for forfeiture of "[a]ll moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter...."

around the building, close off vacant parts of the building, warn tenants, and even call the police. *See, e.g., United States v. One 1973 Rolls Royce,* 43 F.3d 794, 816 (3d Cir.1994) (listing examples of such efforts). Despite these steps, the tenant may continue selling drugs. In this situation, given that the landlord took all reasonable measures to try to stop the illegal activity, it was thought unfair to confiscate his property. In the language of the statute, the landlord was "without consent."

The above analysis is based on the assumption that the claimant owned the property at the time it was being used in an illegal manner. However, the forfeiture statute on its face also applies to a claimant who did not own the property at the time of the illegal act but instead acquired it sometime later. With regard to this type of claimant, known as the post-illegal act transferee, there is a time gap between the illegal act and the subsequent ownership of the property. It is this time gap—in combination with an awkwardly written statute—that has led to problems in interpretation. In particular, courts have struggled over how to apply the defense to the post-illegal act transferee who was not aware of the illegal act at the time it took place but who was aware of it at the time he received the property. In this context, how do you evaluate whether the "illegal act" was committed without the claimant's "knowledge" or "consent"?

With regard to knowledge, the time gap is less of a problem. Arguably, one can still have knowledge of the illegal act after the fact. Claimant here seems to accept this fact and does not dispute that knowledge should be measured at the time of receipt of the property rather than at the time of the illegal act. Therefore, we will use the date of transfer of the property as the relevant measuring date when we analyze the question of knowledge in Section II below. *See United States v. One Parcel Of Real Estate Located At 6640 SW 48th St.,* 41 F.3d 1448, 1452 (11th Cir.1995) (measuring knowledge at the time of property transfer); *United States v. Real Property, Buildings, Appurtenances And Improvements Located At 221 Dana Avenue,* 81 F.Supp.2d 182, 189 (D.Mass.2000) (same).[5]

With regard to consent, however, it is more difficult to say that a person consented after the fact. Claimants in this situation have seized upon this latent ambiguity in the statute and have argued that they qualify under the consent prong because they logically could not have consented to an illegal use of their property that took place before they owned the property. This is the argument made by claimant here in support of her motion for summary judgment.

The circuit courts have split on whether to accept this argument under two related

---

**5.** The question of when to measure "lack of knowledge" in the case of the post-illegal act transferee did come up indirectly in *United States v. Parcel of Land, Buildings, Appurtenances and Improvements, Known as 92 Buena Vista Avenue, Rumson, New Jersey,* 507 U.S. 111, 113 S.Ct. 1126, 122 L.Ed.2d 469 (1993), but it was not ruled upon by the Court. In the plurality opinion, Justice Stevens in a postscript stated: "whether or not the text of the [forfeiture] statute is sufficiently ambiguous to justify resort to the legislative history, equitable doctrines may foreclose the assertion of an innocent owner defense by a party" who "was unaware of the illegal transaction when it occurred but learned about it before she accepted the forfeitable proceeds." *Id.* at 129, 130, 113 S.Ct. 1126. In the concurring opinion, Justice Scalia intimated that he would take the opposite view and would measure knowledge at the time of the illegal act: "I do not find inconceivable the possibility that post-illegal-act transferees with post-illegal-act knowledge of the earlier illegality are provided a defense against forfeiture." *Id.* at 139, 113 S.Ct. 1126. In short, the conflicting dicta in *92 Buena Vista Avenue* has not lessened the uncertainty in this area.

subsections of the forfeiture statute.[6] In *United States v. One 1973 Rolls Royce,* 43 F.3d 794 (3d Cir.1994), the Third Circuit analyzed this argument in great detail in a lengthy opinion and concluded that a post-illegal act transferee who was unaware of the illegal act at the time it took place could not have consented to the earlier illegal act and therefore would always qualify as an innocent owner under the statute. The case involved an automobile used to transport individuals to a various drug distribution meetings. The government was proceeding under subsection (a)(4) of § 881, which deals with forfeiture of "conveyances," such as cars and planes. Subsection (a)(4) contains a similar innocent owner defense to that contained in subsection (a)(6).

The Third Circuit noted that the statutory language was ambiguous when applied to such post-illegal act transferees. *Id.* at 815 (the language of the statute is "[f]illed with negatives" and "is nearly impenetrable."). Given that the forfeiture statute is punitive and quasi-criminal in nature, the court reasoned that it should be construed in favor of the claimant. *Id.* at 819. As a matter of policy, the court thought that the result was not unreasonable given that one purpose of the innocent owner defense was "to give owners of property an incentive to prevent use of that property in the drug trade." *Id.* The court stated: "People who are not owners at the time the act is committed are simply in no position to prevent the improper use. Penalizing such owners would do little to accomplish the ends of those forfeiture statutes." *Id.* The Third Circuit conceded that the result was not perfect but put the blame for the problem on the failure of Congress to consider the differences between pre-illegal

and post-illegal act transferees when drafting the forfeiture statute. The dissent in the case believed that the majority holding was "more an act of judicial abdication than judicial restraint" and resulted in an absurd interpretation of the innocent owner defense, one that "contravenes both logic and Congress' very purpose in promulgating [the forfeiture statute], that is, to curb illegal drug activity." *Id.* at 821.

In *United States v. One Parcel Of Real Estate Located At 6640 SW 48th St.,* 41 F.3d 1448 (11th Cir.1995), the Eleventh Circuit considered this same argument under subsection (a)(7) of § 881, which deals with forfeiture of "real property." Subsection (a)(7) contains a similar innocent owner defense to that contained in subsections (a)(4) and (a)(6). The Eleventh Circuit agreed with the dissent in *1973 Rolls Royce* and concluded that a post-illegal act transferee is "not an innocent person who has 'unwittingly' associated himself with a wrongdoer." *Id.* at 1452–53. The court therefore declined to follow the Third Circuit's reasoning:

> Classifying post-illegal act transferees as innocent owners because they had no opportunity to consent creates a sweeping grant of immunity from forfeiture and a gaping loophole in an intentionally comprehensive policy.

*Id.* at 1453. The Eleventh Circuit concluded that the best approach to this problem was to hold that the lack of consent defense is simply "not available" to post-illegal act transferees. *Id.* at 1452. In other words, post-illegal act transferees could only qualify as innocent owners under the knowledge prong.

■ As between these two approaches, we are more persuaded by the Eleventh Circuit's interpretation of the statute, as it better reflects the original conception of

---

**6.** Neither the Supreme Court nor the Seventh Circuit has directly ruled on this specific argument.

the consent prong. Claimant's argument, in our opinion, rests on a misguided notion of what is meant by "lack of consent," one that essentially reverses the burden of proof under the statute. Specifically, claimant argues that the government has not been able to show that she ever affirmatively consented to her boyfriend's illegal drug activities. The statute, in contrast, places the burden of proof on claimant to show that she was "without consent." We think that this means that she must point to some "affirmative steps" taken to communicate her lack of consent. *See, e.g., United States v. 152 Char–Nor Manor Blvd. Chesterton, Md.*, 922 F.Supp. 1064, 1069 (D.Md.1996) ("A defendant may not assert 'lack of consent' and fall within the innocent owner exception unless she takes affirmative steps to prevent property's illegal use."); *see also United States v. 141st Street Corp.*, 911 F.2d 870, 879 (2d Cir.1990) ("consent [ ] must be something more than a state of mind"). This is how the defense has been applied in the case of the pre-illegal act transferee.

■ Applying this more active definition of "lack of consent," it is clear that claimant cannot qualify under the consent prong as she never took any steps to demonstrate her lack of consent—either at the time the illegal acts took place or later at the time she received the property. In fact, as discussed below, she maintains she never even knew about her boyfriend's illegal activities during the relevant time period. If she did not know about them, then she could not have disapproved of them. *See id.* at 878 ( the word "consent"

means compliance or approval; "[i]n order to comply with or approve of something, it is only common sense that one must have knowledge of it").

There is an additional reason to reject claimant's argument. Up until this point, we have not focused specifically on the fact that this is a "proceeds" case under subsection (a)(6) of § 881. As noted above, the forfeiture statute has a number of different subsections dealing with different types of properties. The Third Circuit in *1973 Rolls Royce* considered this issue under subsection (a)(4) of § 881 and based its holding on the fact that both subsections (a)(4) and (a)(7) were designed to encourage property owners to prevent their property from being used to "facilitate" a crime. Subsection (a)(6) likewise applies to property used to "facilitate" a drug crime but it also applies to "proceeds traceable to" to such a crime. It is clear that the purpose of this latter "proceeds" clause was not to encourage prevention of the original criminal act. For this reason, the Third Circuit in *1973 Rolls Royce* expressed doubt as to whether its holding would also apply to a proceeds case under subsection (a)(6). 43 F.3d at 819 n. 28. In short, the Third Circuit's opinion is distinguishable and does not really support claimant given that this is a "proceeds" case.

In sum, although there is no perfect answer to this question, we think that the Eleventh Circuit's approach is the correct one. Under that approach, claimant cannot qualify as an innocent owner under the consent prong. Therefore, we deny claimant's motion for summary judgment.[7]

7. During the drafting of this opinion, Congress passed legislation revising the forfeiture statutes. Civil Asset Forfeiture Reform Act of 2000, H.R. 1658. The President is expected to sign the new Act. The Act, which would not apply to this case, attempts to correct some of the problems relating to the post-illegal act transferee. For example, the Act contains two separate sections to the innocent owner defense, one directed at the pre-illegal transferee and one at the post-illegal transferee. The latter type of claimant must show that she was (i) a bona fide purchaser or seller for value and (ii) that she did not know and was

## II. Lack Of Knowledge.

Now that we have ruled against claimant under the consent prong, we must address whether she can prevail under the knowledge prong. This issue was brought up when the government filed its own cross-motion for summary judgment.

■ As an initial matter, we need to clarify what the relevant inquiry is with regard to this knowledge prong. The government asserts that the relevant question is whether claimant knew—at the time she received the gifts—that her boyfriend had been involved in illegal drug dealing. We think that this is the correct formulation.[8] As we have already noted, although the matter is not entirely clear, we think that the date of the property transfer is when knowledge should be measured. We also agree with the government that knowledge in this context includes willful blindness. *See United States v. Antzoulatos*, 962 F.2d 720, 724 (7th Cir.1992) ("It is well settled that wilful blindness or conscious avoidance is the legal equivalent to knowledge."); *see also United States v. Rodriguez*, 53 F.3d 1439, 1447 (7th Cir.1995) (knowledge can be inferred "from a combination of suspicion and indifference to the truth"); *1973 Rolls Royce*, 43 F.3d at 809 ("despite the textual absence of willful blindness terminology, both § 881(a)(6) and § 881(a)(7) have been interpreted by many courts to require owners to demonstrate not only lack of actual knowledge, but also lack of willful blindness").

■ This matter is before us on a motion for summary judgment, which may be granted when the record contains no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue for trial will be found only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Given this procedural posture, we will not consider the admissions allegedly made by claimant to Agent Howard because claimant subsequently in her deposition denied ever making those admissions.[9]

■ Even without these admissions, we think that the undisputed evidence is such that no rational jury could find in favor of claimant. Oates knew that Harrison had a large amount of money and an expensive lifestyle. He provided her with numerous and expensive gifts and payments. Over the course of their relationship, Harrison provided Oates with a rent-free apartment ($1300 a week), several luxury cars (worth approximately $85,000), a diamond tennis bracelet ($10,000), a two and a half carat diamond ring ($15,000), and a generous weekly allowance (up to $1000 a week). During this time, Harrison lived in a separate apartment and owned at least two cars. His mother had significant assets (approximately $600,000) that were not explained by her modest work history. In addition to having significant assets, Har-

reasonably without cause to believe that the property was subject to forfeiture. H.R. 1658, § 983(d)(3)(A). It seems clear that, if the new statute applied here, claimant could not prevail as an innocent owner.

8. Harrison gave Oates the 1992 Lexus in November 1994; he gave her the diamond tennis bracelet in December of 1994; and he gave her the diamond ring in June of 1995.

9. Claimant allegedly admitted, among other things, that she suspected that her boyfriend was a drug dealer and that friends and even Harrison himself told her he was a drug dealer. If accepted as true, these admissions would completely undermine claimant's innocent owner defense. As noted above, this court already concluded, in the probable cause hearing, that Agent Howard was a credible and truthful witness.

rison often dealt in cash even when large sums were involved. For example, he paid for the $10,000 diamond bracelet in cash. The weekly allowance given to Oates was paid in cash put in an envelope for her to pick up from the gas station owned by Harrison.

Although Oates knew her boyfriend had large amounts of cash to buy her these gifts, she knew little about how he got the money to support his lifestyle. In her summary judgment briefs, Oates offers no explanation. In her deposition, she makes passing references to the fact that Harrison owned a gas station that employed three or four people and that she made one visit to a building, which she thought Harrison may have owned. Yet she has provided little basis to believe that the gas station business could have generated the amount of cash needed to support the types of purchases detailed here.

Overall, Oates offers little response to the above facts. At bottom, she simply relies on her own assertion that she never knew (nor even suspected) that her boyfriend was involved in narcotics trafficking until 1996, when she received a copy of the forfeiture complaint from her current attorney. We do not believe that this bare denial, under the facts of this case, is enough to defeat the government's summary judgment motion. *See generally United States v. One Parcel of Property, Located At 755 Forest Road, Northford, Ct.,* 985 F.2d 70, 73 (2d Cir.1993) (granting summary judgment in favor of government because uncontested factual evidence undermined claimant's assertion in her affidavit that she was unaware of her husband's narcotics activity: "the claimed state of mind is so inconsistent with the uncontested facts").

Even if we accept Oates' claim that she did not actually know about her boyfriend's illegal activities, which is hard to believe, we do not believe that she could convince a reasonable jury that she was not willfully blind.[10] When Oates first arrived in Chicago, Harrison provided her with a luxury apartment, a car, and a weekly cash allowance. Oates accepted these gifts without asking Harrison where he got the money. In fact, at this time, Oates had no idea what Harrison did for a living.[11] Likewise, when she was told that the apartment she would be living in was put in Harrison's sister's name, she never asked why.

The most damaging example of willful blindness relates to the fact that, during this general time period, Harrison was arrested and convicted and began serving prison time on state narcotics charges. For almost the entire year of 1994, while she was dating Harrison, Oates claims that she never knew that he had been arrested and was waiting for trial. She says that she first learned about her boyfriend's legal problems the day before he was to begin serving his nine-year sentence. Although she learned at this time that he had been convicted of a crime, she claims that she did not know what that crime was—*i.e.* she suggests that she did not know whether he was convicted on narcotics violations as opposed to some other type of crime.

Oates said she did not find out what crime her boyfriend had committed even though she attended a court hearing the day he was taken into custody. When asked in her deposition about this question, she gave the following explanation: "I couldn't hear in the room that I was sitting

---

**10.** For example, we find it hard to believe that, during the entire time she dated Harrison, Oates never once heard a rumor that her boyfriend was a drug dealer.

**11.** Later, she was told that he owned a gas station business but even then she knew little about the business.

in, so I did not know what was going on." (Oates Dep. at 44.) While Harrison was in prison, Oates visited him approximately every other weekend. Amazingly, during these numerous visits, she still did not learn why her boyfriend was in jail. She never asked him why. Her explanation: "I felt that if he wanted me to know, he would tell me when he was ready." (*Id.* at 47.) During this same period, Harrison gave Oates the $15,000 diamond ring and the $70,000 Range Rover.

In sum, throughout the time she dated Harrison, Oates made a conscious effort to avoid learning anything about her boyfriend. In particular, we find it very hard to understand why Oates did not have the slightest interest in ever learning why her boyfriend was serving a nine-year prison sentence. This seems to be a classic case of willful blindness. For this reason, and for the other reasons stated above, we grant summary judgment in favor of the government and order forfeiture of the subject property.

### CONCLUSION

For the foregoing reasons, this court denies claimant's motion for summary judgment and grants the government's cross-motion for summary judgment. It is hereby ordered:

a. All persons concerned shall be, and hereby are, held in default and any title, right or interest in the defendant 1992 Lexus SC400, VIN JT8UZ30C2N0017133, the defendant 14K gold and diamond tennis bracelet (10 Carats), and the defendant diamond ring (2.5 Carats) is hereby extinguished;

b. The defendant 1992 Lexus SC400, the defendant gold and diamond tennis bracelet, and the defendant diamond ring are hereby forfeited to the United States of America in ac-cordance with the provisions of 21 U.S.C. § 881(a)(6);

c. The United States Marshall shall dispose of the above-described de-fendant property in accordance with the law; and

d. The cost bonds submitted in this matter by claimant Keshia Oates shall be returned by the United States Marshal, less any expenses, to Keshia Oates, through her attor-ney.